# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No: 2:08 CR 23** |
| | ) | |
| **SIDNEY O. SELLERS** | ) | |

## OPINION AND ORDER

### I. PROCEDURAL BACKGROUND

On May 14, 2008, defendant Sidney Sellers was indicted on one count of possessing with the intent to distribute fifty or more grams of crack in violation of 21 U.S.C. § 841(a)(1), one count of possessing with the intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), and one count of possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). (DE # 38.) Defendant went to trial in 2008, and was convicted on all counts. The Seventh Circuit Court of Appeals reversed defendant's conviction on appeal, and remanded the case for a new trial, including all pre-trial proceedings. *United States v. Sellers*, 645 F.3d 830, 840 (7th Cir. 2011.)

On March 1, 2012, defendant filed the current motion to suppress. (DE # 134.) The government responded a few weeks later (DE # 137), and defendant filed a reply brief. (DE # 139.)

## II. FINDINGS OF FACT[1]

At the September 12, 2012, suppression hearing, DEA Special Agent Hubert Davidson, Gary Police Corporal Mike Smith, and Gary Police officer Doug Geyer all testified. The government also introduced exhibits. Defendant's counsel cross examined all three law enforcement officers. The court finds testimony of Agent Davidson, Cpl. Smith, and Officer Geyer to be credible.

On February 18, 2008, a confidential informant ("CI") contacted DEA Special Agent Hubert Davidson and told Agent Davidson that he had set up a deal where the CI would purchase nine ounces of crack from a supplier. The CI told agent Davidson that he had been in contact with an individual named Brian (last name unknown). Brian had arranged for an individual named Sid (last name unknown) to deliver the nine ounces of crack to the CI. The CI had provided Agent Davidson with information in the past.

The CI also told Agent Davidson that he had purchased crack from Sid on two prior occasions. He described Sid as a heavyset black male, approximately 34-35 years old, with short hair, and gold teeth. The CI also told Agent Davidson that Sid liked to drive fancy cars. The CI had previously seen Sid driving a Dodge Magnum, a 2006 blue Nissan Maxima, a GMC Denali, and also a foreign car, although the make was

---

[1] All facts are taken from testimony given by DEA Agent Hubert Davidson, former Gary Police Cpl. Mike Smith, and former Gary Police Officer Doug Geyer at the September 12, 2012, suppression hearing.

unknown to the CI. Agent Davidson told the CI to call him the next day so they could arrange the transaction.

On the following day, after getting in contact with the CI, law enforcement set up preparations for monitoring the exchange. The DEA held a meeting in Gary outlining the operation with law enforcement officers from Michigan City, Merrillville, and Gary. The agents hoped to conduct the transaction at the McDonald's on Grant street in Gary. The agents that were monitoring the transaction were planning on conducting a traffic stop on Sid's vehicle prior to the transaction. The CI and agents left the CI's vehicle parked in the McDonald's parking lot and waited at the 80/94 overpass.

The CI continued to contact Brian at the request of the agents. Brian could not identify the car that Sid was driving that day, but did inform the CI that Sid was passing Cline Avenue, which is a few exits west of Grant Street. In a subsequent phone call, Brian informed the CI that Sid was located at the Champs liquor store on Grant street.

After learning about Sid's current location, the agents and the CI, who at that point were still located near the 80/94 expressway entrance ramp, started driving toward the McDonald's parking lot.[2] Upon passing Champs, Agent Davidson noticed a silver Nissan Maxima parked at the liquor store. There were only two cars parked at the

_____

[2] The Champs liquor store is between the entrance ramp and the McDonald's store.

liquor store at that point: the Maxima, and another car.[3] Other units noticed that the Maxima was occupied by a black male. The maxima had backed into the parking space, which Agent Davidson thought was odd for that particular parking lot. After the CI saw the Maxima, he told agents it was similar to the vehicles that he had seen Sid drive in the past, although he had not ever seen Sid driving this particular car.

At that point, Brian called the CI again, who told the CI that Sid was preparing to leave the Champs liquor store. The agents and the CI, who had driven past Champs, turned around and started heading back toward Champs. Other units observed the Maxima leaving the Champs parking lot.

Cpl. Mike Smith of the Gary Police Department was also part of the investigation. Cpl. Smith was getting updates from the DEA agents from Gary Police Officer Doug Geyer, who had a DEA radio, and was getting updates from DEA agents throughout the operation. Cpl. Smith knew that the target of the investigation was possibly parked at the Champs liquor store, and Cpl. Smith observed the Silver Maxima leave the champs parking lot and turn north onto Grant street. Cpl. Smith then observed the Maxima, which was driving in the left lane, make an abrupt lane change to the right lane, causing several cars to swerve to avoid getting into a collision. Cpl. Smith

---

[3] The testimony at the suppression hearing established that there may have been another car in the parking lot. The court will assume that there was a second car in the parking lot.

4

believed the driver of the Maxima had just committed a traffic violation.[4] At that point, Cpl. Smith activated his lights and effectuated a traffic stop of the Maxima.[5]

After stopping the Maxima, Cpl. Smith asked the driver of the vehicle for his driver's license and registration. Smith also told the driver the reason for the stop, and the driver admitted the traffic violations and tried to justify the maneuver he had just made. The driver produced a license, but could not find his registration. The license revealed that the driver's name was Sidney Sellers.

Another Gary Police Department officer, Doug Geyer, arrived at the scene and ran a check on defendant's license. That check revealed that defendant's license was valid and that he did not have any active warrants. While Officer Geyer ran this check,

---

[4] Cpl. Smith later cited defendant for violating Ind. Code 9-21-8-24, which states: A person may not:

(1) slow down or stop a vehicle;

(2) turn a vehicle from a direct course upon a highway; or

(3) change from one (1) traffic lane to another;

unless the movement can be made with reasonable safety. Before making a movement described in this section, a person shall give a clearly audible signal by sounding the horn if any pedestrian may be affected by the movement and give an appropriate stop or turn signal in the manner provided in sections 27 through 28 of this chapter if any other vehicle may be affected by the movement.

[5] There was inconsistent testimony as to whether Cpl. Smith radioed the DEA agents to get permission to pull defendant over. That fact is irrelevant because the court finds credible Cpl. Smith's testimony that he observed defendant commit a traffic violation.

Agent Davidson slowly drove by the traffic stop with the CI, and the CI identified the driver of the Maxima as "Sid." Cpl. Smith was standing next to Officer Geyer's vehicle at that point, and heard over the police radio that the CI had identified the driver as Sid. Defendant was still in his vehicle at that point.

Cpl. Smith returned to the vehicle and asked defendant if he had found his registration. Defendant had not found his registration. Defendant appeared very nervous. Cpl. Smith then asked defendant to step out of his vehicle so they could speak at the rear of the vehicle.

Cpl. Smith asked defendant if he had any weapons on his person. Defendant said that he did not, but that he had a gun in the vehicle, which was located between the driver's seat and the center console. Defendant also told Smith that he had a gun permit in his wallet. Smith asked to see the permit, and defendant produced an Illinois firearm owner's identification card. Defendant, however, failed to produce a valid Indiana handgun license.

Officer Geyer then entered the front seat of defendant's car and retrieved a fully-loaded Glock 9mm semiautomatic handgun. The gun was exactly where defendant said it would be - between the driver's seat and the center console. After the gun was recovered, defendant was handcuffed and arrested for possessing a handgun without a license.

After defendant was placed under arrest, Cpl. Smith decided the vehicle needed to be towed because defendant was under arrest and there was no one else there to

move the vehicle. Cpl. Smith also did an inventory search of the Maxima prior to towing the vehicle. While doing the inventory search, Cpl. Smith found several plastic bags containing a powdery substance, which, according to the parties' briefs, was later identified as the crack and powder cocaine that led to defendant's indictment. Cpl. Smith eventually cancelled the tow request because Agent Davidson informed him that the DEA was going to take control of the vehicle.

Later that day, when he got back to the station, Cpl. Smith wrote defendant citations for unsafe movement (IND. CODE 9-21-8-24) and for failing to have his registration (IND. CODE 9-18-2-21).

## III. DEFENDANT'S ARGUMENTS

Defendant makes several arguments. Defendant argues that the stop of his car was illegal for two reasons. First, he argues that there was no traffic violation. Second, he argues the investigation leading up to the traffic stop did not give law enforcement agents reasonable suspicion to make the stop. (DE # 134.) Defendant also argues that the search of his vehicle's passenger compartment that recovered the gun cannot be justified by either probable cause or officer safety. Finally, defendant argues that the search of the trunk that revealed the drugs was not a proper inventory search because his arrest was not justified. Defendant also argues police did not have probable cause to search the trunk. Each of these arguments will be addressed in turn.

## IV. ANALYSIS

### A. The Initial Stop of Defendant's Car

#### 1. Traffic Violation

Defendant's argument with regard to the traffic violation is that there was no traffic violation. (DE # 134 at 6.) Specifically, defendant argues that the testimony of the law enforcement officers at the suppression hearing was inconsistent as to the traffic violation, and therefore, the government cannot prove that a traffic violation occurred.

As a general rule, a traffic stop does not violate the Fourth Amendment any time the police have probable cause to believe that a traffic violation has occurred. *United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012); *see also United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000) ("[S]o long as the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense, the officer has probable cause to stop the driver."). "The prosecution bears the burden of proving by a preponderance of the evidence that a warrantless stop is supported by probable cause." *United States v. Garcia-Garcia*, 633 F.3d 608, 612 (7th Cir. 2011).

"A stop and search can be reasonable even if the defendant did not actually commit an offense as long as the officer reasonably believed an offense occurred." *United States v. McDonald*, 453 F.3d 958, 960 (7th Cir. 2006); *see also United States v. Hernandez-Rivas*, 513 F.3d 753, 759 (7th Cir. 2008) *(*"[P]robable cause exists when the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense."); *Cashman*, 216 F.3d at 587 (the "propriety of

the traffic stop does not depend, in other words, on whether [defendant] was actually guilty of committing a traffic offense . . . . The pertinent question instead is whether it was reasonable for [the police officer] to *believe* that the [traffic violation had occurred]." (emphasis in original)).

The traffic law at issue here, Ind. Code § 9-21-8-24 states:

A person may not:
1. (1) slow down or stop a vehicle;
(2) turn a vehicle from a direct course upon a highway; or
(3) change from one (1) traffic lane to another;
unless the movement can be made with reasonable safety. Before making a movement described in this section, a person shall give a clearly audible signal by sounding the horn if any pedestrian may be affected by the movement and give an appropriate stop or turn signal in the manner provided in sections 27 through 28 of this chapter if any other vehicle may be affected by the movement.

As noted above, the court finds credible Cpl. Smith's testimony that he observed defendant switch lanes in an unsafe manner, which would be a violation of Ind. Code § 9-21-8-24, for which he was later ticketed. Thus, the government has demonstrated by a preponderance of the evidence that the stop was supported by probable cause: Cpl. Smith had a reasonable belief that the driver of the Maxima had violated the Indiana law prohibiting unsafe movement. Therefore, Cpl. Smith had probable cause to stop the Maxima.

## 2. Reasonable Suspicion

Defendant argues that the law enforcement officers lacked reasonable suspicion to believe that the driver of the Maxima was involved in any illegal drug related

activity. The government responds that at the time Cpl. Smith made the stop, he had

reasonable suspicion to make the stop based on the drug investigation.

In *United States v. Walden*, the Seventh Circuit discussed the appropriate standard

for traffic stops based on reasonable suspicion:

> A traffic stop is governed by the principles established in *Terry v. Ohio*, 392
> U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. *See Berkemer
> v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 82 L.Ed.2d 317 (1984). Under
> *Terry*, a police officer may perform an investigative stop when there is
> reasonable suspicion, based on specific and articulable facts, that "criminal
> activity may be afoot." *Terry*, 392 U.S. at 30, 88 S. Ct. 1868. Whether or not
> there is reasonable suspicion is determined based on the totality of the
> circumstances. *See United States v. Sokolow*, 490 U.S. 1, 8, 109 S. Ct. 1581,
> 104 L.Ed.2d 1 (1989); *United States v. Jerez*, 108 F.3d 684, 693 (7th Cir.1997).

146 F.3d 487, 490 (7th Cir. 1998). In other words, a *Terry* stop is permissible where the

police officer has "reasonable suspicion, supported by articulable facts, that criminal

activity is afoot." *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005). In making a

reasonable suspicion assessment, "'it is imperative that the facts be judged against an

objective standard: would the facts available to the officer at the moment of the seizure

or the search 'warrant a man of reasonable caution in the belief' that the action taken

was appropriate?" *United States v. Mancillas*, 183 F.3d 682, 695-96 (7th Cir. 1999)

(quoting *Terry*, 392 U.S. at 21-22). The real issue is whether the police officer's conduct

was reasonable, given the officer's suspicions and the surrounding circumstances. *Id*.

The Supreme Court has stated that reasonable suspicion is a much lower

standard than the "fair probability" requirement of probable cause. *United States v.

Sokolow*, 490 U.S. 1, 7 (1989) ("We have held that probable cause means 'a fair

probability that contraband or evidence of a crime will be found,' . . . and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause . . . .") (internal citations omitted); *see also Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."). "Reasonable suspicion has been defined as 'some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.'" *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

"'When a single informant provides the tip that brought police to a *Terry* stop, [The Seventh Circuit] looks to the amount of information given, the degree of reliability, and the extent that the officers can corroborate some of the informant's information.'" *United States v. Booker*, 579 F.3d 835, 838-39 (7th Cir. 2004) (quoting *United States v. LePage,* 477 F.3d 485, 488 (7th Cir. 2007)). An anonymous tip, by itself, will not provide reasonable suspicion. *United States v. Bullock*, 632 F.3d 1004, 1012-13 (7th Cir. 2011). An anonymous tip, adequately corroborated, may, however, be sufficient to support a finding of reasonable suspicion. *Id.*

In *United States v. Booker*, officers received a 911 call that gunshots had been heard at a specific intersection. *Booker*, 579 F.3d at 836-37. When police arrived at that

intersection, a man ("the informant") flagged the police down, identified himself, and explained that he and his daughter had both been involved in altercations with the same group of people earlier in the evening, including an altercation in which he believed a gun was fired. *Id.* The informant then pointed out a van he believed that some of the men from the altercations were in. *Id.* Officers stopped the van, ordered the defendant out, and found a gun. The defendant moved to suppress the gun, arguing that the officers lacked reasonable suspicion to stop the van. *Id.*

The Seventh Circuit concluded that the officers had reasonable suspicion to stop the van. *Id.* at 839. First, the court noted that the informant was not an anonymous caller and that the informant gave specific details regarding the crime, including a description of the suspect and an address where the crime occurred. *Id.* at 839. The court found reasonable suspicion existed even though the informant was not completely sure that van he identified contained the suspect. *Id.* The court noted that "[r]easonable suspicion is a lower threshold than probable cause and 'does not deal with hard certainties, but with probabilities.'" *Id.* (quoting *United States v. Jerez*, 108 F.3d 684, 693 (7th Cir. 1997).

There was no anonymous tipster in this case. The CI was working closely with law enforcement to set up the transaction over the course of two days. Additionally, agent Davidson had received information from the CI in the past. Any argument that defendant has that this CI was not reliable is not persuasive.

Defendant argues that the information the CI was providing about Sid was not corroborated. Specifically, defendant points to the fact that the CI had never seen

defendant driving the silver Maxima and that defendant left the area without engaging in a drug deal (which is what "Sid" was supposed to do).

The government directs the court to several facts that it says support a finding of reasonable suspicion. First, the phone conversations between the CI and Brian revealed that Sid was passing Cline Avenue. Second, a later phone conversation revealed that Sid was parked in the Champs parking lot, and that there were only two cars in that lot. The CI also noted that the Maxima was the type of car he had seen Sid driving in the past. The Maxima was also backed into its parking space, which Agent Davidson thought was odd in that situation, as there was only one other car in the parking lot. Finally, Brian told the CI that Sid would be leaving the parking lot at Champs, and the Maxima then left that parking lot shortly thereafter.

"[T]he knowledge of one officer can be imputed to another where police officers are communicating with one another." *Id.* at 839. Thus, at the point when Cpl. Smith stopped defendant's car, he knew that Sid, the target of the DEA investigation, was supposed to be coming to the area to sell crack to the CI. He also knew that Brian had let the CI know that Sid was parked at Champs, and there were only two cars in that lot. He also knew that the CI identified the Maxima as the type of car that the CI had seen Sid driving in the past. Additionally, he knew that the Maxima left the parking lot when Sid was supposed to be leaving the parking lot.

As noted above, "[r]easonable suspicion is a lower threshold than probable cause and does not deal with hard certainties, but with probabilities." *Id.* (citations and

quotations omitted). In this case, Cpl. Smith had specific and articulable facts that criminal activity was afoot. *Walden* 146 F.3d at 490. Thus, under the totality of the circumstances, Cpl. Smith had reasonable suspicion the stop the Maxima.

**B. The Search of the Passenger Compartment to Retrieve the Weapon**

Defendant argues that even if law enforcement officers were justified in stopping the Nissan Maxima, the officers did not have probable cause to search the passenger compartment for the gun. Additionally, he argues that the search cannot be justified as a protective sweep. The government argues that the search was justified because police had probable cause to search the car and because the search was a proper protective sweep.

**1. Protective Sweep**

"[I]f [an] officer has a reasonable suspicion that the driver or passenger is armed or may be able to gain immediate control of a weapon, he may conduct a protective search of the passenger compartment for accessible weapons." *United States v. King*, 332 F. App'x 334, 336-37 (7th Cir. 2009); *see also United States v. Arnold*, 388 F.3d 237, 239 (7th Cir. 2004) ("An officer with a reasonable suspicion that a motorist may be armed and may be able to gain immediate control of weapons may conduct a protective search of the passenger compartment of the vehicle without a warrant."). Specifically, in *Michigan v. Long*, the Supreme Court stated:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts,

reasonably warrant" the officer in believing that the suspect is dangerous
and the suspect may gain immediate control of weapons.

*Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983) (quoting *Terry,* 392 U.S. at 21); *see also*

*United States v. Evans*, 994 F.2d 317, 320 (7th Cir. 1993). A search in those circumstances

must be limited to the area where a weapon may be placed or hidden. *Arnold*, 388 F.3d

at 239.

"In assessing the reasonableness of any search, the court balances the degree of

intrusion against the government's justification for the search." *United States v. Schlatter*,

411 F. App'x 896, 899 (2011). "[T]he legality of such a search depends on 'whether a

reasonably prudent man in the circumstances would be warranted in the belief that his

safety or that of others was in danger.'" *United States v. Evans*, 994 F.2d 317, 320 (7th Cir.

1993) (quoting *Long*, 463 U.S. at 1050). In making this determination, the court looks to

the totality of the circumstances. *Id.*

When Cpl. Smith and Officer Geyer searched for the gun, they knew that

defendant was part of an ongoing DEA drug investigation. Specifically, they knew that

a drug dealer named "Sid" was in the area to sell drugs to the CI.[6] By the time the

search was conducted, the officers also knew that the CI had identified the driver of the

Maxima as Sid, the driver of the Maxima was named Sidney Sellers, and that defendant

had a firearm in the car.

---

[6] As noted above, "[t]he knowledge of one officer can be imputed to another
where police officers are communicating with one another." *Booker*, 579 F.3d at 839.

Defendant argues that the Supreme Court's decision in *Arizona v. Gant* precludes the argument that officer safety can be a justification for the search. Specifically, defendant argues, that "*Gant* prohibits law enforcement from conducting a search of an automobile for the purposes of ensuring officer safety, where the defendant has been removed from the passenger compartment of the automobile." (DE # 134.) "In *Gant,* the Court reminded lower courts that established precedent 'authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search.'" *United States v. Slone*, 636 F.3d 845, 852 (7th Cir. 2011) (quoting *Arizona v. Gant*, 556 U.S. 332, 343 (2009)).[7]

The Supreme Court faced a slightly different factual situation in *Long*. In that case, the defendant met officers at the rear of his vehicle after being pulled over. *Long*, 463 U.S. at 1035-36. The front passenger door was left open, and the officers observed a large hunting knife on the floor of the driver's side of the car. *Id.* The defendant was not under arrest at the time of the search. In *Long,* the Court noted: "Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from police control and retrieve a weapon from his automobile." *Id.* at 1051.

---

[7] In *Gant*, officers searched defendant's car after defendant had been arrested, handcuffed, and locked in the back of a patrol car. 556 U.S. at 335.

There appears to be some ambiguity in circumstances, like the case at hand, where the suspect has been removed from the car (like the defendant in *Long*), but has not been handcuffed or arrested (like the defendant in *Gant*). The Sixth Circuit discussed this issue in *United States v. Lurry*:

> During a *Terry* stop, *Long* allows officers to search an automobile's passenger compartment for weapons if the officers have a reasonable belief—"based on 'specific and articulable facts' "—that the suspect is dangerous and may "gain immediate control of weapons." *Long,* 463 U.S. at 1049 (quoting *Terry v. Ohio,* 392 U.S. 1, 21 (1968)). This rule recognizes that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Id.* at 1047. Although *Long does not apply where the suspect is handcuffed and under arrest, see Arizona v. Gant,* 556 U.S. 332, 351 (2009), it applies where the suspect is not secured and might imminently reenter the car. *Long,* 463 U.S. at 1051.

No. 11–5604, 2012 WL 2337329, at *2 (6th Cir. June 20, 2012) (emphasis added).

Additionally, the Sixth Circuit, in *Lurry*, and other circuits have held that *Gant* does not apply when a suspect has not been arrested. *See id.* at 3 ("*Gant* does not apply to cases where the suspect has not yet been arrested."); *see also United States v. Hagins,* 452 F. App'x 141, 145-46 (3d. Cir. 2011) (concluding that *Gant* did not apply in factual situation similar to the case at hand, with the exception that the defendant in *Hagins* had been handcuffed outside the vehicle); *United States v. Griffin*, 589 F.3d 148, 154 n.8 (4th Cir. 2009).

In this case, defendant was not handcuffed, was not under arrest, and was not in the back of the squad car when the search for the gun took place. The officers knew that defendant was the target of a DEA drug investigation and that defendant had a gun in his car. Defendant could have broken away from police and grabbed the gun out of the

car. Offer Geyer knew exactly where the gun was, and retrieved the gun from that location. Under the totality of the circumstances, the officers in this case had reasonable suspicion that defendant may have been able to gain immediate control of a weapon, *King*, 332 F. App'x at 336-37, and thus were justified in carrying out this minimally invasive search to ensure their own safety.

### 2. Probable Cause

The government also argues that law enforcement officers had independent probable cause to search defendant's vehicle. Under the automobile exception to the requirement that a warrant is generally needed to conduct a search, if the police have probable cause to believe that a "vehicle contains evidence of criminal activity, [they] may search any area in which the evidence might be found." *United States v. Nicksion*, 628 F.3d 368, 377 (7th Cir. 2010); *see also United States v. Seymour*, 519 F.3d 700, 713 (7th Cir. 2008) ("'[A] vehicle may be stopped and searched without a warrant if there is probable cause to believe the vehicle contains contraband or other evidence of illegal activity.'" (quoting *United States v. Navarro,* 90 F.3d 1245, 1252 (7th Cir. 1996)).

"'Probable cause' exists where based on a totality of the circumstances 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). It requires only a probability, not absolute certainty, that contraband or evidence of a crime will be found. *Id.* Probable cause "'does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is

more likely than not that the suspect committed a crime.'" *United States v. Funches*, 327

F.3d 582, 586 (7th Cir. 2003) (quoting *United States v. Carrillo,* 269 F.3d 761, 766 (7th Cir.

2001)). Police officers may draw reasonable inferences from the facts based on their

training and experience. *Zahursky*, 580 F.3d at 521. To determine if probable cause exists,

the court must look at the totality of the circumstances. *United States v. Cruz-Rea*, 626

F.3d 929, 939-940 (7th Cir. 2010). Finally, "police may search 'any area of the vehicle in

which the evidence might be found' so long as there is probable cause to believe a

vehicle contains evidence of criminal activity." *United States v. Clinton*, 591 F.3d 968, 971

(7th Cir. 2010) (quoting *Gant*, 556 U.S. at 347).[8]

In this case, once defendant was out of the car, Cpl. Smith asked defendant if he

had a gun on him, and defendant told Cpl. Smith that he had a gun in the car, located

between the driver's seat and the center console. Defendant also produced an Illinois

firearm identification card. Defendant did not, however, produce documents showing

that he was licensed to carry a firearm in Indiana.

Thus, the court finds, by a preponderance of the evidence, that, under the totality

of the circumstances, there was "a fair probability that contraband or evidence of a

crime" would be found in the passenger compartment. *Zahursky*, 580 F.3d at 521.

Specifically, the officers had probable cause to believe that the car contained evidence of

the crime of possessing a gun without the proper permit. *See* IND. CODE. 35-47-2-1.

---

[8] The government has the burden of showing that the search fell within a
recognized exception to the warrant requirement. *Zahursky*, 580 F.3d at 521.

The defendant directs the court to 18 U.S.C. § 926A, which states:

> Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle: *Provided,* That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console.

Defendant's argument here is that at the time the officers searched his vehicle and discovered the gun, they had no way of knowing that the gun was not being carried in a way which complied with 18 U.S.C. § 926A.

This statute requires that the firearm not be accessible from the passenger compartment, unless the car does not have a separate compartment, like a trunk. The car defendant was driving did have a trunk, and defendant told officers that the gun was between the driver's seat and the center console, thus making it accessible from the passenger compartment. Defendant's argument with regard to this statute is not persuasive.

### C. The Search of the Trunk that Produced the Drugs

Finally, defendant argues that the search of the trunk that revealed the drugs was not a proper inventory search because his arrest was not constitutional. Defendant also argues police lacked the probable cause required to search the trunk. The government contends that the search of defendant's trunk was constitutional because it was a proper

inventory search, and because the police had acquired probable cause at that point to search the car for drugs.

### 1. Inventory Search

"Inventory searches constitute a well-recognized exception to the warrant requirement and are reasonable under the Fourth Amendment." *United States v. Cartwright*, 630 F.3d 610, 613 (7th Cir. 2010). "An inventory search is lawful if (1) the individual whose possession is to be searched has been lawfully arrested, and (2) the search is conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures." *Id.* at 614. "'Both the decision to take the car into custody and the concomitant inventory search must meet the strictures of the Fourth Amendment.'" *Id. United States v. Duguay*, 93 F.3d 346, 351 (7th Cir. 1996)). "[T]he decision to impound (the 'seizure') is properly analyzed as distinct from the decision to inventory (the 'search')." *Id.* (citation and quotation omitted).

As to the first element, defendant argues that his arrest was illegal because the search that recovered the gun was illegal. As discussed in more detail above, the search was not unconstitutional. Once the officers knew that defendant possessed a gun in his vehicle's passenger compartment and did not have a valid gun license under Indiana law, they had probable cause to believe that defendant had violated Indiana law requiring handgun owners to have a license.

As to the second element, the testimony at the suppression hearing established that the Gary Police Department had a policy of towing vehicles after a driver is placed under arrest.[9] The testimony also revealed that the Gary Police Department had a policy that requires officers to do an inventory search of the vehicle before the vehicle is towed. The purpose of this search is to inventory the items within the car and to check the vehicle for any damage. This is to protect the police department and the towing company from accusations that items were stolen from the car, or that the car was damaged after it was towed.

"The decision to impound an automobile, unless it is supported by probable cause of criminal activity, is only valid if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots." *Duguay*, 93 F.3d at 353. First, it is important to note that the decision to impound the vehicle was made pursuant to Gary Police Department Policy. The testimony at the hearing established that the Gary Police Department had a policy of towing vehicles after the driver has been arrested.

Defendant argues, however, that the decision to have the car towed was improper because the officers made no effort to contact someone who could have come to move the car. The Gary Police Department was not required to do this, and the decision to tow the vehicle was not improper. *United States v. Clinton*, 591 F.3d 968, 972

_____

[9] The testimony also established that defendant's car was still partially in the roadway even though it was pulled over to the side of the road.

(7th Cir. 2010) ("That [defendant's] girlfriend, the owner of the car, could have been called to take possession of the car, is irrelevant."); *see also United States v. Cherry*, 436 F.3d 769, 775 (7th Cir. 2006) (finding that the Fourth Amendment does not "demand that police offer a motorist an alternative means of removing his vehicle that will avoid the need to tow it and conduct an inventory search.").

The government has established, by a preponderance of the evidence, the decision to tow and the subsequent search of defendant's car were lawful, and that the search fell into the inventory exception to the warrant requirement.

### 2. Probable Cause

Defendant argues the police lacked probable cause to search the trunk. The government contends that once Cpl. Smith saw defendant's driver's license identifying himself as Sidney Sellers, and once the CI identified the driver of the Maxima as "Sid," the police had probable cause to believe that the Maxima contained the drugs that Sid was supposed to deliver to the CI.

At the time that Cpl. Smith searched the trunk of the car, Cpl Smith knew that: (1) "Sid" had sold the CI narcotics on two prior occasions;[10] (2) Sid was in the area to sell drugs to the CI; (3) Sid had been parked in the Champs parking lot; (4) there were only two cars in the Champs parking lot, one of which the CI identified as the type of car Sid drove; (5) that car left the Champs parking lot; (6) the driver of the Maxima that Cpl.

---

[10] As noted above, "[t]he knowledge of one officer can be imputed to another where police officers are communicating with one another." *Booker*, 579 F.3d at 839.

Smith had pulled over was named Sidney Sellers; and (7) the CI identified Sidney Sellers as the Sid that had sold him narcotics in the past. Under the totality of the circumstances, there was "a fair probability that contraband or evidence of a crime will be found in a particular place[,]" *Zahursky*, 580 F.3d at 521, thus providing probable cause and justifying the search of the trunk. Therefore, the government has established, by a preponderance of the evidence, that Cpl. Smith had probable cause to search the trunk.

## V. CONCLUSION

For the foregoing reasons, defendant's motion to suppress is DENIED. (DE # 134.)

**SO ORDERED.**

Date: September 14, 2012

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT